[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This case is before this Court on appeal from a Final Decision and Order issued by the Department of Environmental Management (DEM) denying Georgia J. Ure's (hereinafter "Plaintiff") application to install a hydroelectric facility at Rhode Island Dam No. 262 located in Hopkinton, Rhode Island. Jurisdiction is pursuant to G.L. 1956 (1988 Reenactment) §42-35-15.
FACTS/TRAVEL
Plaintiff, Georgia Ure is the owner of a non-functioning hydroelectric facility located at Dam No. 262 on Locustville Pond in Hopkinton, Rhode Island. Joint (Jt) Exhibit 22. Mrs. Ure's dam has been in existence for at least one hundred (100) years and had originally been used for water power. Transcript, May 25, 1988 (1 Tr.), at 71-72. This facility was converted to a hydroelectric generating facility some time in the early part of the twentieth (20th) century; however, the facility has been inoperable for quite some time. Id. Mrs. Ure now proposes to renovate the facility by installing a turbine that would give the facility the capability of producing fifty (50) kilowatts of electricity. 1 Tr. at 50. Mrs. Ure anticipates utilizing a portion of this electricity to run a mill complex located at the site and owned by Mrs. Ure. All excess electricity will be purchased by Narragansett Electric. 1 Tr. at 27.
In May 1985 Mrs. Ure began the application process to renovate the facility. 1 Tr. at 13. In May 1986 Mrs. Ure received a preliminary permit from the Federal Energy Regulatory Commission and then in October 1986 received a permit from the Dam Section of DEM to repair the gates to the dam. Jt. Exhibit 18; Jt. Exhibit 23. DEM's Fresh Water Wetland Section determined that Locustville Pond, the location of the dam, is a valuable wetland under Wetland Regulation 7.06(b)(1); therefore, Mrs. Ure applied to DEM for approval to alter a freshwater wetland pursuant to § 2-1-21(a) of the General Laws of R.I. 1956. Jt. Exhibit 2; Jt. Exhibit 1. DEM, however, relying in part on input from the Fresh Water Wetland Section and the Division of Fish and Wildlife, denied Plaintiff's application determining that the proposal would have a high probability of upsetting the Department's fish restoration program and thus would have a negative impact on the wetland. Jt. Exhibit 3. Subsequent to this denial, however, Mr. Gibson of DEM's Division of Fish and Wildlife wrote to Plaintiff acknowledging that when he initially evaluated Mrs. Ure's application he had incorrectly concluded that the sluiceway velocities (velocity leading into the turbine) would be too high for migrating fish species and would affect the fish passageway. Jt. Exhibit 5. DEM, however, did not revoke its denial of the permit. Rather, the Department determined that the proposal was inconsistent with the best public interest and public policy because hydropower projects are inconsistent with DEM's fish restoration project. Decision and Order, at 35.
Mrs. Ure filed a timely appeal to DEM's decision and an Administrative Hearing was held between May 25, 1988 and December 7, 1988. During the hearing it was revealed that DEM's Division of Fish and Wildlife administers an anadromous fish restoration program on the Wood-Pawcatuck River, the watershed that feeds Locustville Pond. Id. at 40-41. Anadromous fish are those that hatch from eggs laid in and developed in fresh water but then migrate and spend most of their adult lives in salt water before migrating back to the freshwater spawning grounds. At the present time there are a number of dams along the Wood-Pawcatuck River above and below Mrs. Ure's dam at Locustville Pond. Transcript, December 6, 1988 (4 Tr.), at 36. These dams currently prevent a full fish run from being established because only two (2) of the five (5) dams below Mrs. Ure's dam have fish ladders that enable the fish to migrate upstream. Id. at 35.
The makeup of Mrs. Ure's dam in its present condition gives the fish several options in their downstream travel. Presently, the fish may go down either a bypass spillway, the emergency spillway or down the turbine intake channel. Transcript, June 8, 1988 (2 Tr.), at 48-49. As depicted in the pictures entered into evidence, the spillways in their current condition are extremely rocky which raises the possibility of disorienting and descaling of the fish, as well as possible stranding. See, Applicant's Exhibit 1; Transcript, June 7, 1988 (2 Tr.), at 49.
According to Mrs. Ure's proposal the downstream passage of the fish will be altered in that the new facility will attract the fish in Locustville Pond to Spillway B because of the strong current caused by the water going through the turbine. 2 Tr. at 76-77. According to the proposal the fish will head down an intake channel toward the turbine but they will be prevented from going into the turbine by a screen. Id. As already noted it was conceded by DEM that the velocity leading into the turbine would not be strong enough to pull the fish into the screen. Jt. Exhibit 5. Mr. Charles Ritzi, a marine biologist, opined that because fish follow the flow of the current, the force of the water across the screen heading down a flume (an open-ended pipe connected to the side of the spillway) would attract the fish down the flume and into a plunge pool where they will continue their trip downstream. 2 Tr. at 77. Plaintiff's experts testified that although there may be a slight delay at the turbine, this delay would be minimal. Id. at 50. The experts felt that mortality rate caused by this new system would be too low to calculate and even opined that the mortality rate would decrease thus being an improvement over present conditions at the site. 1 Tr. at 92.
Contrariwise, DEM argued that the renovation would cause the fish to be more susceptible to predators. Mr. Mark R. Gibson, a marine biologist from DEM, testified that he felt that the delay resulting from the "decision-making" the fish would have to undergo at the face of the turbine, as well as once they reach the plunge pool (at the base of the flume), would leave the fish susceptible to predators thus impinging on the fish mortality rate and hampering the fish restoration program. Transcript, December 7, 1988 (5 Tr.) at 19-20.
At the conclusion of all the evidence, the Hearing Officer denied Mrs. Ure's application deciding, as a matter of law, that Mrs. Ure's proposal "is inconsistent with the State's Fish Restoration Program because of the delays in migration and the heightened risk of predation that [the] proposal poses."Decision and Order, p. 43. The Officer also concluded as a matter of law that because the State's energy policy on hydropower development is repugnant to the state's fish restoration program and the Department's policy of denying hydropower projects on the Wood-Pawcatuck River, DEM's policy "must override the state energy policy on hydropower." Id. at 44. Thereafter, on April 27, 1989, the Director adopted the Hearing Officer's Findings of Fact and Conclusions of Law as a Final Decision and Order of the Director. Id. at 45.
On appeal, plaintiff argues that the record is devoid of competent evidence supporting the hearing officer's conclusion that the proposal would degrade the value of the wetland. Mrs. Ure also maintains that the hearing officer exceeded his statutory authority by finding that DEM's fish restoration policy must override the State's hydropower policy. In addition, plaintiff attacks the Division's "no hydropower" policy as being arbitrary and capricious and also argues that the fish restoration program is not in the public interest. Plaintiff also challenges several technical errors in the hearing officer's decision which plaintiff alleges affects her substantial rights. Finally, plaintiff questions the fairness of having a DEM employee serve as the Hearing Officer.
STANDARD OF REVIEW
This Court is granted jurisdiction to review decisions of the Department of Environmental Management pursuant to G.L. 1956 (1988 Reenactment) 42-35-15. This statute also mandates the scope of review permitted by this Court. More specifically, Section42-35-15(g) provides:
 42-35-15. Judicial review of contested cases.
 (g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
Accordingly, when reviewing an agency's decision this Court must not substitute its judgement for that of the agency in regard to the credibility of witnesses or the weight of evidence.Costa v. Registrar of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. R.I. Conflict of Interest, 509 A.2d 453, 458 (R.I. 1986). Rather, this Court must confine itself to review of the record to determine if "legally competent evidence" exists to support the agency decision. Environmental ScientificCorporation v. Durfee, March 2, 1993, No. 91-644-M.P. at 15. "If competent evidence exists in the record considered as a whole, the court is required to uphold the agency's conclusions." Id.,
citing Barrington School Committee v. Rhode Island State LaborRelations Board, 608 A.2d 1126, 1138 (R.I. 1992). Legally competent evidence is defined as the presence of "some" or "any" evidence supporting the agency's findings. Sartor v. CoastalResources Management Council, 542 A.2d 1077, 1082-83 (R.I. 1988). Thus, the Court may reverse factual conclusions of administrative agencies only when they are "totally devoid of competent evidentiary support in the record." Milardo v. CoastalResources MAnagement Council, 434 A.2d 266, 272 (R.I. 1981). However, the Court may reverse or modify the agency's final decision if it is "clearly erroneous in view of the reliable, probative and substantial evidence on the whole record."Environmental Scientific Corp., supra, at 15, citing §42-35-15(g)(5). Questions of law decided by administrative agencies are not binding on the court. Narr. Wire Co. v.Norberg, 376 A.2d 1, 6, 118 R.I. 596 (1977). Therefore, this Court "may review questions of law to determine what the law is and its applicability to the facts." Chenot v. Bordeleau,561 A.2d 891, 893 (R.I. 1989); Carmody, 509 A.2d at 458.
DISCUSSION
In the instant action, plaintiff first argues that there is no competent evidence to support the Director's decision to deny Mrs. Ure's application for approval to alter a wetland. In particular, plaintiff assigns error to the Hearing Officer's conclusion of law that "the proposal is inconsistent with the state fish restoration program because of the delays in migration and the heightened risk of predation that the proposal poses."Decision and Order, at 43. According to Plaintiff, the only evidence to support this conclusion is the testimony of Mark Gibson, a DEM employee qualified as an expert in marine biology. Plaintiff maintains that Mr. Gibson's opinion is merely speculative and therefore is insufficient to support the Director's Decision. In response, DEM maintains that there is no factual error upon which to vacate or remand the Decision and Order. Therefore, the Department argues that the Decision and Order must be upheld.
In reviewing the entire record, this Court notes that during the course of the Administrative Hearing, both the plaintiff and DEM offered their own expert marine biologists who testified regarding the impact the proposal would have on fish migration. In reaching his decision, the Hearing Officer accepted the testimony of DEM's expert, Mark Gibson, who concluded that the proposal would cause delays in the downstream migration and thus subject the fish to increased predation risks. In reviewing Mr. Gibson's testimony as well as the entire record to determine if legally competent evidence exists to support the Agency's decision, this Court begins with the premise that it must not substitute its judgment for that of the Agency with regard to weight of evidence or credibility of witnesses. Costa, 543 A.2d at 1309. However, as to questions of law, this Court may determine what the law is and its applicability to the facts.Chenot, 561 A.2d at 893.
The Rhode Island Supreme Court has long held that an expert's opinion must be predicated upon facts legally sufficient to form a basis for his conclusion. Alterio v. Biltmore ConstructionCorp., 119 R.I. 307, 312, 377 A.2d 237, 240 (1977); Gorham v.Public Bldg. Auth., 612 A.2d 708, 717 (R.I. 1992). Therefore, when an expert testifies he must specifically set forth the factual basis that supports his conclusion. L'Etoile v. Directorof Public Works, 89 R.I. 394, 402, 153 A.2d 173, 178 (1959);Nasco. Inc. v. Director of Public Works, 116 R.I. 712, 721,360 A.2d 871, 876 (1976); Alterio, 119 R.I. at 313, 377 A.2d at 240; Burrillville Racing Ass'n v. Tellier, 574 A.2d 749, 752 (R.I. 1990). This enables the Court to determine the probative force of an expert's opinion and to ascertain whether the expert's conclusion is mere conjecture or speculation. Alterio,
119 R.I. at 313, 377 A.2d at 240, citing Dickinson-TidewaterInc. v. Supervisor of Assessments, 273 Md. 245, 253 329 A.2d 18. 23-24 (1974).
In the instant action, DEM's expert Mark Gibson acknowledged that when he formulated his opinion that there will be sufficient delay in front of the screen and again in the plunge pool to subject the fish to increased predation, he did not perform the necessary calculations to determine the velocity of the water either in front of the screen or in the plunge pool. 5 Tr. at 58. This is despite the fact that the major premise to his opinion was the fact that migratory fish follow the maximum current flow. 5 Tr. at 18. Mr. Gibson also acknowledged that he has never conducted a study as to the fish mortality rate under present conditions at the dam site, (5 Tr. at 61), nor has Mr. Gibson done a specific study in the area for fish predation. Id. at 22. Rather, Mr. Gibson based his opinion on his "general [knowledge] of what types of fish are in the pond and what type of mammals . . . [are present]." Id. at 21-22. Therefore, as Mr. Gibson conceded, his testimony regarding the delay the fish would encounter was mere "speculation". 5 Tr. at 59. (Emphasis added).
Contrariwise, plaintiff presented the testimony of Jonathon Truebe, a fisheries engineer and designer of the fish passageway, who testified that he considered the problem of predators in his design and therefore designed the system to keep the fish moving in a flow pattern. 2 Tr. at 27. Mr. Truebe utilized a study done in California to design the fish passageway so that the fish suffer a minimal degree of mortality. In addition, Mr. Truebe, under the premise that fish follow the maximum flow, utilized the flow data given to him by Charles Ritzi and did his own calculations to come to the conclusion that the maximum flow at the face of the turbine would be across the vector and that the flow in the plunge pool would be 12 cubic feet per second. 2 Tr. at 27. Even DEM's expert Mr. Gibson, despite not performing the necessary calculations, conceded that he "would suspect the [water] movement along the vector, along the screen is probably greater than that into the turbine." 5 Tr. at 57. This force of maximum flow, according to Charles Ritzi, an expert marine biologist, would keep the fish on a continuous route down the stream. 2 Tr. at 50.
In reviewing Mr. Gibson's testimony and the entire record, it is clear to this Court that there was no factual basis on which Mr. Gibson could rest his conclusion that there would be sufficient delay to leave the fish susceptible to predators. As Mr. Gibson admitted, his testimony regarding the delay the fish would encounter was mere "speculation". 5 Tr. at 59. Therefore, without sufficient factual basis to support his conclusions, Mr. Gibson's testimony is entitled to no weight. Alterio, 119 R.I. at 312, 377 A.2d at 240. Accordingly, there is insufficient evidence in the record to support the Hearing Officer's conclusion of law that Mrs. Ure's proposal would subject the migrating fish to increased predation.
DEM's Decision and Order is further tainted by Mr. Gibson's admission that it would be impossible to make a recommendation in favor of a hydroelectric facility given the Division of Fish and Wildlife's unwritten policy against hydroelectric facilities on the Wood-Pawcatuck River. 5 Tr. at 54-55. Mr. Gibson articulated the position of the Division of Fish and Wildlife when he testified that the Division considers the anadromous fish restoration program and hydroelectric facilities "to be mutually exclusive uses of the river; no matter what the [hydroelectric facility's] design may be." Id. at 52. According to John Stolgitis, Chief of the Division of Fish and Wildlife, every hydroelectric facility will be a type of mortality source on the migrating fish. The Division, therefore, without consideration of the design or efficiency of a particular proposal, has decided to maintain a blanket prohibition against hydropower facilities "until someone demonstrates a zero degree of [fish] mortality." 4 Tr. at 34.
The Hearing Officer essentially accepted the Department's unwritten policy with his conclusion of law that: "The Department has not acted unreasonably, arbitrarily, or capriciously in denying this application because it has maintained and has consistently enforced its `no hydropower' policy on those streams on which it is attempting to restore anadromous fish." Decisionand Order, at 44. The blind acceptance of this unwritten, unpromulgated policy, however, like Mr. Gibson's testimony, is unsubstantiated by any factual data on the record. In fact, DEM's blanket prohibition was formed without any type of research or investigation into the compatibility of the fish restoration program and hydropower development. 5 Tr. at 35. DEM admitted at the hearing that it has not investigated the possibility of a hydropower facility on the Wood-Pawcatuck River "due to time and manpower." 5 Tr. at 35. Rather, the basis for maintaining this blanket prohibition is essentially out of fear for setting a precedent. 4 Tr. at 44; Transcript, June 9, 1988 (3 Tr.) at 86. According to Mr. Gibson: "We have a very strong concern that one hydro-facility could turn into two and three and four. We have already successfully opposed other sites. It would be very conceivable if this were to go into operation, those applications would resurface." 5 Tr. at 36-37.
In essence, therefore, the Division began review of Mrs. Ure's application under the premise that they were required to deny the hydropower proposal out of fear of setting a precedent.[1] 4 Tr. at 44; 3 Tr. at 86. The policy supporting this premise, however, has never been promulgated as a formal rule under § 2-1-20.1. Thus, this "policy" is not a legislative rule with the effect of law. Lerner v. Gill, 463 A.2d 1352, 1358 (R.I. 1983). Rather, at a minimum, it is an interpretive rule which the Court can chose to accept or reject. See, ProfileConstruction, Inc. v. DEM, C.A. 91-3154, October 26, 1992, Israel, J., citing Lerner v. Gill, 463 A.2d 1352, 1358 (R.I. 1983). If an agency "wishes to promulgate a blanket prohibition . . . [the agency must] promulgate a lawful legislative rule."Id. Thus, this Court finds that such a blanket prohibition without the force of a legislative rule or any type of factual basis to support it, is unreasonable and clearly violates plaintiff's substantial rights.
Furthermore, Rhode Island General Laws require the Director to review an application for approval to alter a wetland to determine if it is in the best public interest to allow such alteration. G.L 1956 (1988 Reenactment) § 2-1-21(a). The Supreme Court, in J.M. Mills, Inc. v. Murphy, construed § 2-1-21(a)'s "best public interest" standard to "incorporate the contents of §§ 2-1-18 and 2-1-19." J.M. Mills. Inc. v. Murphy, 116 R.I. 54, 63, 352 A.2d 661, 666 (1976). Mills also requires the Director, "[p]ursuant to this authoritative statement in the best public interest, . . . to make case-by-case determinations of whether a proposed project would significantly inhibit the present valuable functions of wetland." Id. (emphasis added). This blanket prohibition by DEM prevents such a case-by-case determination. Thus, DEM's blanket prohibition is also in violation of the statutory provisions requiring case-by-case determinations of whether the application is in the best public interest. G.L. 1956 (1988 Reenactment) § 42-35-15(g)(1).
In addition this Court assigns error to the Hearing Officer's conclusion of law that DEM's anadromous fish restoration program and the Division's "no hydropower" policy must override the State's energy policy on hydropower. Once again, the Director is bound by § 2-1-21(a)'s mandate that he deny applications that are not in the best public interest. However, there is no basis either on the record or in law to support the Hearing Officer's conclusion that when a state policy is repugnant to DEM's policy, it is in the best public interest for DEM's policy to override the state's policy.
In coming to this conclusion, the Court first recognizes the important role that the Department plays in acting as "steward" for the environment. However, this Court also recognizes the importance the Rhode Island General Assembly, as well as the U.S. Congress has placed on hydropower development. For example, both the U.S. Congress and Rhode Island General Assembly have taken steps to encourage the development of hydroelectric power. In particular, the Secretary of Energy has been instructed by Congress to establish a program "to encourage municipalities, electric cooperatives, industrial development agencies, nonprofit organizations, and other persons to undertake the development of small hydroelectric power projects in connection with existing dams which are not being used to generate electric power."16 U.S.C. § 2701. Congress has also promulgated measures to shorten hydroelectric facilities' licensing procedures in an effort to expedite the development of hydroelectric facilities. PhoenixHydro Corp. v. Federal Energy Regulatory Com., 249 App. D.C. 354, 775 F.2d 1187 (1985); see also 16 U.S.C.A. § 2705 et.seq. The Rhode Island General Assembly has additionally recognized the importance of hydropower development through the creation of tax exemptions and tax credits for hydroelectric facilities. See, G.L. 1956 (1988 Reenactment) §§ 44-3-3(24) and44-30-22(a). In passing these measures, the General Assembly declared: "[i]t shall be the policy of this state to support and foster the development of hydropower generating facilities by the establishment of tax incentives for those owners of existing dams who install hydroelectric power generation equipment." §44-30-20(b).
Furthermore, the Rhode Island State Planning Council has directly dealt with the issue of hydropower development as it relates to the environment. On March 13, 1986, after a public hearing pursuant to § 42-11-10, the State Planning Council adopted the State's hydropower policy. Jt. Exhibit 27A. This policy is contained in Report Number 46: Energy FacilitySiting, March, 1984, State Guide Plan Element 781 and essentially finds that DEM's fish restoration program and hydropower facilities can coexist. Id. In addition to the Governor's Office of Energy Assistance, R.I. Department of Economic Development and the State Planning Office, the Department of Environmental Management directly participated in formulating that section of the State Guide Plan dealing with hydropower policy. Id.; 5 Tr. at 76.
In addressing the Wood-Pawcatuck River system and DEM's fish restoration program, the State Guide Plan provides:
 06-02-03-D Policies for the Pawcatuck Basin
 Policies: In formulating a policy on hydropower development, the Council realizes that the uniqueness of the Wood-Pawcatuck Watershed merits its being given a special status under which no new dams built solely for the purpose of hydropower shall be constructed because of the value within the watershed of the fisheries resources, recreation resources, wildlife habitat, and historic mill villages. . . . The burden of proof, as to the effectiveness of mitigation measures, shall be upon the applicant. Therefore, hydropower may be developed at existing sites in this basin, but the priority for such development must be considered in conjunction with these four uses as well as the maintenance and improvement of water quality. Resolution of disputes relative to competing uses within the watershed may necessitate the application of formal environmental mediation techniques which can be integrated into the permitting process. . . . Because of the sensitive nature of existing habitat in this watershed, restoration of hydropower in the basin must be of the run-of-river type. Specific mitigation measures may include installation of fish-passage facilities and use of fish protection screens to protect against fisheries mortality associated with turbine intakes. The standard of efficiency for these measures shall be that they enhance the fisheries restoration effort by providing less fish mortality than that achieved by direct passage over existing dams. Jt. Exhibit 27A (Emphasis added).
Therefore, it is clear from the language of the Report that the Council came to the conclusion that DEM's fish restoration program and hydropower development could potentially coexist on the Wood-Pawcatuck River. This Court recognizes that the Planning Council report is not a legislative enactment or an administrative rule. However, the report was issued at the conclusion of a public hearing and with the participation of all interested agencies, including DEM. 5 Tr. at 76. More importantly, the report articulates the concerns of competing state policies and offers a means to resolving these interests.
Thus, in determining if the hydropower facility on the Wood-Pawcatuck River is in the best public interest, this Court finds that the Hearing Officer erroneously ignored the state's energy policy by finding that DEM's fish restoration program must override the state energy policy. Under § 2-1-21(a) the Director must deny approval to alter a freshwater wetland if in the opinion of the director granting approval would not be in the best public interest. G.L. 1956 (1988 Reenactment) § 2-1-21(a). In interpreting the "best public interest" standard of §2-1-21(a), this Court is guided by the principles of statutory interpretation requiring the Court to effectuate and establish the intent of the Legislature. In re Advisory Opinion,504 A.2d 456, 459 (R.I. 1986). When the language of the statute is clear and unambiguous, the words of the statute must be given their plain and obvious meaning. Id. "Public interest" is defined as being "something in which the public, the community at large, has some pecuniary interest or some interest by which their legal rights or liabilities are affected . . . Interest shared by citizens generally in affairs of local, state or national government." Black's Law Dictionary, at 1229 (6th ed. 1990). The "best public interest" standard of § 2-1-21(a) has been interpreted to incorporate the policies enunciated in §§ 2-1-18
and 2-1-19. See, J.M. Mills, Inc. v. Murphy, 116 R.I. 54, 60,352 A.2d 661 (1976).[2] However, the Rhode Island Supreme Court has consistently held that a statute will not be read to create an absurd and unreasonable result. Bailey v. American Stores,610 A.2d 117, 120 (R.I. 1992); Trembley v. City of CentralFalls, 480 A.2d 1359, 1363 (R.I. 1984); Coletta v. State,106 R.I. 764, 769, 263 A.2d 681, 684 (1970). Were this Court to read the "best public interest" standard of § 2-1-21(a) to pertain solely to the fish restoration program then it assuredly would result in an absurd and unreasonable result. This is especially true in light of the overwhelming importance attributed to hydropower development by both Rhode Island General Assembly and the U.S Congress.[3]
In conclusion, this Court finds that there was insufficient evidence to support the Director's conclusion of law that the proposal would increase the mortality rate of the fish by increasing the predation. In addition this Court finds that the Director exceeded his statutory authority by imposing a blanket prohibition against hydropower facilities and by not considering the state's hydropower policy in determining what is in the best public interest.
Accordingly, for the reasons stated herein, plaintiff's appeal is sustained and the Department of Environmental Management's decision is reversed.
Counsel shall submit the appropriate order for entry.
[1] This is demonstrated by the fact that the Division has never promulgated any design standards to use in evaluating a hydroelectric proposal (5 Tr. at 72); nor did the Division seek information from the U.S. Fisheries Service in reviewing Mrs. Ure's application as has been the practice of the Division to do in the past when confronted with hydroelectric proposals. Id.
at 73.
[2] The Mills Court, however, did not find that the "best public interest" standard was limited solely to those interests expressed in §§ 2-1-18 and 2-1-19. Rather, the Mills Court, in addressing the issue of whether the Wetlands Act was an unconstitutional delegation of legislative power, followed the legal maxim that "the stated purposes of a legislative enactment are relevant to the issue of whether the delegation was adequately cloaked with standards." J.M. Mills, Inc. v. Murphy,
116 R.I. at 63, 352 A.2d 661.
[3] In fact, the U.S. Supreme Court has held that it is not too much to demand of an administrative body that it accommodate one statutory scheme to another without excessive emphasis upon its immediate task in order to effectuate the entire scope of Congressional purpose. Southern S.S. Co. v. Labor Board,316 U.S. 31, 47 (1941) ("It is sufficient for this case to observe that the Board has not been commissioned to effectuate the policies of the Labor Relations Act so single-mindedly that it may wholly ignore other and equally important congressional objectives.").