**In re ADVISORY TO The GOVERNOR (JUDICIAL NOMINATING COMMISSION).**

No. 95–619–M.P.

Supreme Court of Rhode Island.

Jan. 5, 1996.

Harris Weiner, and Joseph S. Larisa, Governors, Providence, for Plaintiff.

John B. Lawlor, Jr., Speaker, Michael A. Kelly, Judicial Nominiating Committee, Providence, for Defendant.

To His Excellency Lincoln Almond, Governor of the State of Rhode Island and Providence Plantations:

We have received from Your Excellency a request in accordance with article 10 section 3, of the Rhode Island Constitution for advice from the justices of this Court on the following question of law:

> "Under R.I. Const. art. X, § 4 and consistent with R.I. Gen. Laws § 8–16.1–5 may the Governor properly request a new list of names from which to fill a vacancy on the Supreme Court from the Judicial Nominating Commission when one or more persons on the original list submitted by the Commission is no longer eligible for consideration by reason of rejection by the legislature, no action by the legislature, withdrawal in the face of anticipated legislative opposition, death, disability, or any other reason?"

In response to our invitation to all interested parties to submit briefs, Your Excellency and the Speaker of the Rhode Island House of Representatives have submitted briefs and have presented their views at oral argument.

■ The justices of this Court are obligated to issue an advisory opinion to the Governor when the question propounded implicates a present constitutional duty awaiting performance by the Governor. *In re Request for Advisory Opinion Regarding House Bill 83–H–5640*, 472 A.2d 301, 302 (R.I.1984). Because article 10, section 4, of the Rhode Island Constitution imposes upon the Gover-

nor an obligation to fill vacancies on the Supreme Court in accordance with a prescribed nomination process and because there is a vacancy at this time on this Court, Your Excellency's question clearly bears upon a constitutional duty currently awaiting your performance. Hence, the question propounded to the justices of this Court presents an appropriate inquiry that we herein address.

On November 8, 1994, the Rhode Island electorate amended the State Constitution to provide that the governor would select individuals for judicial positions from a list compiled by a judicial nominating commission. As approved by the voters, article 10, section 4, directs that:

"The governor shall fill any vacancy of any justice of the Rhode Island Supreme Court by nominating, on the basis of merit, a person from a list submitted by an independent non-partisan judicial nominating commission, and by and with the advice and consent of the senate, and by and with the separate advice and consent of the house of representatives, shall appoint said person as a justice of the Rhode Island Supreme Court. * * * The powers, duties, and composition of the judicial nominating commission shall be defined by statute."

In compliance with this constitutional mandate, G.L.1956 (1985 Reenactment) chapter 16.1 of title 8, as enacted by P.L.1994, ch. 42, § 1 entitled "Judicial Selection" (the statute) was enacted. In particular, Section 8–16.1–5 sets forth the procedure to be followed in the course of the nomination and appointment of justices to the Supreme Court. Section 8–16.1–5(a) directs the Judicial Nominating Commission (the commission) to "publicly submit the names of not less than three (3) and not more than five (5) highly qualified persons for each vacancy [on the Supreme Court] to the governor." The Governor is then required by the statute to nominate one of the candidates from the commission's list within ten days after receiving the list. Specifically, § 8–16.1–5(c) requires that:

"The senate and the house of representatives shall, after seven (7) calendar days of receipt of said nomination, separately con-

sider the nomination, but if either house fails within thirty (30) days after said submission to confirm said nominee, the governor shall appoint some other person to fill said vacancy and shall submit his or her appointment to the senate and to the house of representatives for confirmation in like manner until the senate and the house of representatives shall each separately confirm the nomination. If the nominee is rejected by either house, the commission shall submit a new list of three (3) to five (5) candidates to the governor for the purpose of nomination in accordance with this chapter. Any new list may include but need not be limited to the names of any candidates who were previously submitted to the governor by the commission but who were not forwarded to the senate and to the house of representatives for their advice and consent."

 Your Excellency has posited five situations that may arise during the nomination and confirmation process and has requested that this Court construe the provisions of § 8–16.1–5(c) in respect to whether "a new list of names" must be provided by the commission in each of these cases. Clearly, if a new list is not required, then a nominee must be selected from the remaining names on the list submitted for that vacancy. Because the statute does not unambiguously delineate an answer to each alternative, this Court, as final arbiter on questions of statutory construction, will address each case by construing the enactment so as to effectuate the intent of the Legislature. *Matter of Falstaff Brewing Corp.*, 637 A.2d 1047, 1049–50 (R.I.1994). In so doing, this Court examines statutory provisions in their entirety, attributing to the act the meaning most consistent with the policies and purposes of the Legislature. *Id.*; *Brennan v. Kirby*, 529 A.2d 633, 637 (R.I.1987). We glean the intent and purpose of the Legislature "from a consideration of the entire statute, keeping in mind [the] nature, object, language and arrangement" of the provisions to be construed, *Algiere v. Fox*, 122 R.I. 55, 58, 404 A.2d 72, 74 (1979), and by giving words their plain and ordinary meaning. *Town of East Greenwich v. O'Neil*, 617 A.2d

104, 108 (R.I.1992). In so construing § 8–16.1–5(c), we are adhering to the "fairest and most rational method" of interpreting laws as set forth by Sir William Blackstone in his *Commentaries* of 1758. 1 *Sharswood's Blackstone's Commentaries, Laws of England* 58 (1860). Blackstone delineated five "*signs*" that constitute "the most natural and probable" indices to the will of a legislature, signs that are revealed by means of:

> "[w]ords * * * understood in their usual and most known signification [and in] their general and popular use. * * * If words happen to be still dubious, we may establish their meaning from the *context.* * * * As to the *subject matter,* words are always to be understood as having a regard thereto * * * [with] expressions directed to that end. * * * As to the *effects* and *consequence,* the rule is, that where words bear either none, or a very absurd signification, if literally understood, we must a little deviate from the received sense of them. * * * But, lastly, the most universal and effectual way of discovering the true meaning of a law * * * is by considering the *reason* and *spirit* of it." *Id.* at 58–60.

■ We are led to conclude in light of all these considerations that the clear intent of the electorate and of the Legislature is to promote a broad and merit-based process for the selection of judicial nominees.

■ We have arrived at this conclusion by noting that under the prior constitutional mandate, Supreme Court justices were elected in grand committee by the Legislature. Under the 1994 amendment, a nominee must be confirmed in separate approvals by the House and by the Senate, after the nominee has been selected by the Governor from a list of persons chosen by the commission. Moreover, the commission's list must name three, four or five candidates for each vacancy. Thus, under the 1994 amendment, the selection process has been formally altered to reduce the role of the Legislature, to expand the role of the Governor, and to require that the commission specify three to five candidates "on the basis of merit."

Directed and constrained by these requisites, we address the five situations that Your Excellency postulates.

■ First, in the event of "rejection" by the Legislature, § 8–16.1–5(c) mandates that "the commission shall submit a *new* list of three (3) to five (5) candidates to the governor." (Emphasis added.) The statute, however, fails to operationally define the manifestation of such rejection by the Legislature. In its usual signification, and in its context in § 8–16.1–5(c), "rejection" would connote an actual vote not to confirm a nominee, in other words, a roll call vote of the House or of the Senate in which a majority of either chamber votes in opposition to the nominee. In such a case of rejection of the Governor's nominee, a "new list" of three to five names must be provided to the Governor by the commission, which list may but need not include names from the previous list submitted by the commission to the Governor.

■ Second, in the event that either the House or the Senate fails to confirm the Governor's nominee "within thirty (30) days after said submission to confirm said nominee, the governor shall appoint some other person to fill said vacancy." Section 8–16.1–5(c). It is clear that the statute intends that such a failure to act be construed as a *de facto* rejection by the Legislature, albeit one without a recorded vote. The statute is ambiguous, however, as to whether, after a nominee has been "rejected" by such legislative inaction, the Governor's replacement nominee must be derived from the remaining names on the list from which the Governor named the unconfirmed candidate or, alternatively, whether the commission must submit a "new list" of three to five names to the Governor.

■ We are of the opinion that the statute requires that the commission provide a "new list" to the Governor in such an event. We have reached this conclusion in consideration of the reason and spirit underlying both the constitutional provision and the statute, *viz.,* that legislative control of judicial appointments be reduced and that executive power of appointment be enhanced. Without the

requirement of a new list, the Legislature could, in effect, control the appointment process by acting on a nomination only when the Governor nominates the candidate on a given list who represents the preferred choice of the Legislature. In such a case, the reason and spirit of the constitutional amendment would be effectively thwarted by the Legislature's inaction.

▇ Third, a similar analysis and corresponding rationale persuades us that the withdrawal of a governor's nominee "in the face of anticipated legislative opposition" also requires that the commission present a "new list" to the Governor. The mobilization of legislative opposition during the nominating process can create a powerful weapon in the defeat of a nominee. Therefore, we are led inevitably to conclude that documented, legislative opposition sufficient to result in a nominee's withdrawal presents a situation that is tantamount to rejection. In the case that prompted this inquiry by Your Excellency, significant adverse public reports apparently resulted in opposition sufficient to precipitate the withdrawal of the nominee, thereby effectively rejecting the Governor's choice.

▇ Thus, we are constrained to conclude that only by interpreting § 8–16.1–5(c) to require a "new list" from the commission in the event that any person's nomination is rejected by legislative vote or is not acted upon by the Legislature or is withdrawn in the face of legislative opposition do we preserve the intent of the statute. We note that the commission may fulfill this responsibility by submitting to the Governor three, four or five names that may include none, some or all of the names that have been submitted previously but not selected by the Governor.

▇ Last, in the cases of the death or the disability of a nominee, we are of the opinion that a new list is not required by the statute. Assuming that the approval or disapproval of the Legislature would not have been ascertained prior to the death or disability of a nominee, the integrity of the judicial selection process would be maintained by the Governor's selection of a different nominee from the same list that contained the deceased or disabled nominee.

We decline to speculate or proffer advice in the event of "any other reason" than the five specific ones identified by Your Excellency.

In 1994, the Rhode Island electorate directed that the commission select candidates for judicial positions on the basis of merit, that a nominee be selected by the Governor, and that the Legislature give advice and consent to the nominees. We have concluded that the intent of the statute can be best effectuated by the commission's submitting to the Governor a "new list" in the event a nominee is rejected by the Legislature or fails to win confirmation within thirty days or withdraws because of legislative opposition. The commission would thereby be afforded the advantage of reviewing its selections and of securing the maximal opportunity to present candidates for the Governor's consideration. In this way the context, reason and spirit of the statute would best be fulfilled.

JOSEPH R. WEISBERGER,
Chief Justice
FLORENCE K. MURRAY
VICTORIA LEDERBERG
JOHN P. BOURCIER
Justices