DECISION
Before this Court is an appeal from a decision of the City of Pawtucket Zoning Board of Review (Board), denying the use variance requested by Human Services Realty, Inc. and Community Counseling Center, Inc. (plaintiffs) pursuant to Section 410-12 of the Pawtucket Zoning Ordinance (Ordinance). Jurisdiction is pursuant to G.L. 1956 § 45-24-69.
 Facts/Travel
Plaintiff Human Services Realty, Inc. (HSR) owns the parcel of property located at 150 Walcott Street in Pawtucket, further described as Pawtucket Tax Assessor's Plat 21, Lot 418 (property). The property is located in a Residential Multi-Family Zone (RM). HSR has owned the property since 1993. Plaintiff Community Counseling Center, Inc. (CCC) leases this property where it operates a group home for young children. After plaintiffs constructed a 30 x 50 foot asphalt pad on the property and installed a basketball net, a cease and desist order was issued prohibiting their use of the basketball court.[1] On August 6, 1999, plaintiffs petitioned the Board for a permit to allow the children to return to the court. Because such a use was not listed as an "accessory use," the plaintiffs sought relief by way of a use variance pursuant to Section 410-12 of the Ordinance.
On September 28, the Board held a hearing to consider the petition. There the Board heard testimony from two witnesses. The first witness was Ann Rogan (Rogan), the property manager, who testified on behalf of the plaintiffs. She testified that CCC houses between five and eight children, all under ten years of age. Generally, the children would not use the court after 7:30 at night because they were brought inside in preparation for bed at that time. Children from outside the residence were not permitted to use the court, and they were restricted from such use by a fence and by CCC's adult supervisors. The second witness was Susan Rivert, an abutting neighbor who objected to the permit. At the time of the hearing, she had lived in the neighborhood for fifteen years. She complained that the court caused a noise problem not present before its appearance. Further, she disputed the claims of close adult supervision of the children made by plaintiffs' counsel and testified that the children often went without any such supervision.
On October 5, the Board met to discuss the petition. In addition to the hearing testimony, the Board considered several other pieces of evidence. This additional evidence included a letter sent by two other objecting adjoining property owners, John A. and Barbara L. Mutter; a report from the Planning and Redevelopment Department, advising approval of the appeal; and an inspection of the property by the members of the Board.
After considering all of the evidence, the Board voted 3-2 to deny the petition stating that the plaintiffs had failed to show a loss of all beneficial use of their property because of the Ordinance. On November 10, the Board issued Decision 99-61 (Decision) and denied plaintiffs' petition.
The plaintiffs now appeal this Decision, arguing that Ordinance § 410-12, which prohibits the construction of a basketball court on private property in a residential neighborhood, creates a "legal absurdity" and an overwhelming burden on HSR as the property owners. Also, the plaintiffs argue that the Decision of the Board was arbitrary, capricious, and otherwise "unwarranted." Finally, the plaintiffs argue that the decision of the Board runs contrary to public policy because the court was installed for safety reasons in a child residence facility fully licensed by the State.
 Standard of Review
This Court possesses appellate review jurisdiction of a zoning board of review decision pursuant to G.L. 1956 § 45-24-69 (D):
"(D) The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions or decisions which are:
(1) In violation of constitutional, statutory or ordinance provisions;
(2) In excess of the authority granted to the zoning board of review by statute or ordinance;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
This court, when reviewing the decision of a zoning board of review, must examine the entire certified record to determine whether substantial evidence exists to support the finding of the zoning board of review. Salve Regina College v. Zoning Bd. of Review, 594 A.2d 878, 880 (R.I. 1991) (citing DeStefano v. Zoning Bd. of Review of Warwick,122 R.I. 241, 245, 405 A.2d 1167, 1170 (1979)). "Substantial evidence as used in this context means such relevant evidence that a reasonable mind might accept as adequate to support a conclusion and means an amount more than a scintilla but less than a preponderance." Caswell v. George Sherman Sand and Gravel Co., Inc., 424 A.2d 646, 647 (R.I. 1981) (citing Apostolou v. Genovesi, 120 R.I. 501, 507, 388 A.2d 821, 825 (1978). The essential function of the zoning board of review is to weigh evidence with discretion to accept or reject the evidence presented. Bellevue Shopping Center Associates v. Chase, 574 A.2d 760, 764 (R.I. 1990). Moreover, this court should exercise restraint in substituting its judgment for the zoning board of review and is compelled to uphold the board's decision if the court "conscientiously finds" that the decision is supported by substantial evidence contained in the record. Mendosa v. Corey,495 A.2d 257 (R.I. 1985).
 Use Variances
Section 45-24-31(61)(i) of the Rhode Island General Laws defines a "use variance" as "[p]ermission to depart from the use requirements of a zoning ordinance where the applicant of the requested variance has shown by evidence upon the record that the subject land or structure cannot yield any beneficial use if it is to conform to the provisions of the zoning ordinance." G.L. 1956 § 45-24-31(61)(i). The requirements for a use variance are set forth in § 410-113(A) of the Ordinance, and they are modeled on those requirements set forth in G.L. 1956 § 45-24-41. Section 410-113(A) states in pertinent part:
"(1) In granting a variance, the Board shall require that evidence to the satisfaction of the following standards be entered into the record of the proceedings:
(a) That the hardship from which the applicant seeks relief is due to the unique characteristics of the subject land or structure and not to the general characteristics of the surrounding area and not due to a physical or economic disability of the applicant.
(b) That said hardship is not the result of any prior action of the applicant and does not result primarily from the desire of the applicant to realize greater financial gain.
(c) That the granting of the requested variance will not alter the general characteristic of the surrounding area or impair the intent or purpose of this chapter or the Comprehensive Plan of the city.
(d) That the relief to be granted is the least relief necessary.
(2) The Board shall, in addition to the above standards, require that evidence be entered into the record of the proceedings showing that:
(a) In granting a use variance, the subject land or structure cannot yield any beneficial use if it is required to conform to the provisions of this chapter. Nonconforming use of neighboring land or structures in the same district and permitted use of land or structures in adjacent district shall not be considered grounds for granting a use variance."
 Uses and Accessory Uses
The parties agreed that a basketball court is an "accessory use." Pursuant to that belief, the plaintiffs sought a use variance. Both the Enabling Statute and the Ordinance define "accessory use" as "[a] use of land. . . . customarily incidental and subordinate to the principal use of the land or building. . . ." G.L. 1956 § 45-24-31 (3); see also Code of the City of Pawtucket § 410-132. At the end of the Ordinance, there is a Table of Use Regulations (Table) which dictates the permitted land uses in each zoning district within the City. Section 410-12 provides a guide to the Table of Use Regulations and states that "[u]ses not listed are prohibited," but says nothing about accessory uses. § 410-12(G). Still, there is no listing for a basketball court under the "accessory use" heading in the Table, and thus it is prohibited under a literal reading of the Ordinance.
However, the Supreme Court has refused to apply zoning ordinances literally when, in so doing, it would cause an absurd result. Town of North Kingstown v. Albert, 767 A.2d 659, 662 (R.I. 2001) (citing State v. Flores, 714 A.2d 581, 583 (R.I. 1998); and Kaya v. Partington,681 A.2d 256, 261 (R.I. 1996)). Instead, when interpreting an ordinance, the Court applies the same rules of construction that are applied for statutes. Id. (citing Mongony v. Bevilacqua, 432 A.2d 661, 663 (R.I. 1981)). Thus, when confronted with statutory provisions that are unclear or ambiguous, courts must examine the statutes in their entirety in order to glean the intent and purpose of the Legislature. Id. (citing In re Advisory to the Governor (Judicial Nominating Commission),668 A.2d 1246, 1248 (R.I. 1996)). Moreover, in interpreting a legislative enactment, it is incumbent upon the court to determine and effectuate the Legislature's intent and to attribute to the enactment the meaning most consistent with its policies or obvious purposes. Id. (citations omitted).
The Albert case addressed "earth removal," an activity not specifically enumerated in the North Kingstown town ordinance for the subject district. In Albert, the property in question was used as a farm. As an incident to the farm, the property owners constructed an irrigation pond on their property, removing a portion of earth without a permit and selling the extracted dirt. Although earth removal was not expressly prohibited, the town zoning ordinance stated "[a]ny use not expressly permitted by this ordinance shall be deemed to be prohibited." Id. at 663. The town argued that by implication, the extraction of any earth was a use and not an incidental activity. Therefore, the town claimed that the construction violated the zoning ordinance. However, despite the fact that the Court agreed the owners had violated the literal interpretation of the ordinance, the Court held that earth removal, as applied under the circumstances, was not a "use" implicated by the zoning ordinance. Id. at 664. The term "use" was a defined term under the ordinance and the Zoning Enabling Act as "[t]he purpose or activity for which land or buildings are designed, arranged, or intended, or for which land or buildings are occupied or maintained." G.L. 1956 §45-24-31(60); see also, id. Thus, the Court deemed it necessary to separate the primary purpose of the land from the incidental results of the activity. See generally, Albert, id. The Court stated
 "The sale of the extracted earth was temporary and incidental to the creation of the pond, and the creation of the pond was an incidental, and essential activity to the farming operation. The excavation project does not constitute the primary purpose of the [owner's] land, and thus, we are of the opinion that the project and related earth removal does not constitute a `use' under the zoning ordinance. The use of this land is agricultural; the irrigation pond is a necessary and accessory use to the farming operation; and therefore, does not fall within the purview of the zoning ordinance." Id. at 664.
Consequently, the Court held that the town's interpretation of the zoning ordinance was overly broad and would serve to create an absurd result. Id.
In the subject Ordinance, a basketball court is not a specifically enumerated "use" or an "accessory use." Therefore, under the City's construction of the Ordinance, nearly identical to that of North Kingstown's, all other "uses" would be prohibited, and only the eleven activities enumerated in the Table would be permitted in RM zoned property in the City. Such an interpretation is clearly over broad and runs dangerously close to an infringement on constitutionally protected property interests. Like the ordinance in Albert, the Pawtucket Ordinance requires the Board to make two preliminary findings. First, the Board must determine whether a basketball court changes either the character or nature of the property or the function of its primary purpose as a group home for children, and thus whether it can be characterized as a "use" subject to the Ordinance. Second, the Board must determine whether the basketball court is merely customary and incidental to the Home's primary purpose of providing care for children as a State licensed facility. If so, then it is an "accessory use" and cannot be subjected to a blanket prohibition under the zoning ordinance according. Because a zoning ordinance is in derogation of the common-law right of a property owner to use one's land as one wishes, any doubt as to the legislative intent behind the ordinance must be resolved to the landowner's benefit. Denomme v. Mowry, 557 A.2d 1229 (R.I. 1989); City of Providence v. O'Neill, 445 A.2d 290 (R.I. 1982). The Board cannot deny property rights by allowing the use and restricting all activities that, by definition, are customarily incidental to that use. If the Board allows the "use" of the property, they must allow all other "accessory uses" that accompany that "use" unless expressly prohibited. Accordingly, if the Board finds that the basketball court is customary and incidental to plaintiffs' primary purpose, it is a necessary and accessory use that the Board has no jurisdiction to regulate. Because the Board failed to make these determinations, their Decision was in excess of the authority granted to the zoning board of review by statute, affected by an error of law, and characterized by an abuse or clearly unwarranted exercise of discretion.
The above reasoning corresponds to the great weight of authority on the subject. See The Law of Zoning and Planning, Rathkopf, § 23.06[4] (listing several specific cases where the uses were deemed accessory uses incidental to the primary purpose of the property and therefore permitted despite blanket zoning prohibitions). In City of New Orleans v. Estrade, the court held that the maintenance of two horseshoe pits in a side yard was a proper accessory use. 8 So.2d 536 (La. 1942). There, the court succinctly stated:
 "It was never the intention of the framers of the ordinance to limit the conduct of the citizens in the use and enjoyment of their own premises."
 "There is nothing in the ordinance which prohibits a property owner from playing legitimate games or engaging in similar amusements; nor does the ordinance seek to restrict the use of private property where such use is coincidental with the maintenance of the home. It is not the playing of games, other than golf or tennis (specifically mentioned as accessory uses) which is prohibited but rather the establishment and maintenance of buildings or other structures for public or semi-public use. Thus, the erection and maintenance of pingpong, shuffleboard, croquet, or volleyball courts or courses on zoned residential property for public or semi-public uses might constitute a violation of the ordinance. But, surely, it could not be seriously contended that it is a violation of the zoning ordinance for one to erect a shuffleboard or a badminton court in his own yard for the use and enjoyment of himself, his family and friends, or that it is illegal for children to engage in their various games and amusements in the yards of their homes." Id. at 554-555.
In Hardy v. Calhoun, the Court of Civil Appeals of Texas held that a tennis court to be used solely by one family and to be constructed on the lot containing the dwelling was an accessory use customarily incident to a dwelling. 383 S.W.2d 652 (Tex.Civ.App. 1964). The court acknowledged that there was no direct prohibition against tennis courts, swimming pools, basketball courts, croquet courts, barbecue pits, or similar uses, and none could be implied. See id. The law generally provides that the matter of what constitutes an accessory use is one of factual determination for the zoning boards themselves. See Robert Roy, Annotation, Zoning: What Constitutes "Incidental" or "Accessory" Use of Property Zoned, and Primarily Used, for Residential Purposes, 54 A.L.R. 4th 1034 (1987 and Supp. 2001); and Paula Fitzgerald Wolff, Annotation, Application of Zoning Regulations to Golf Courses, Swimming Pools, Tennis Courts, or the Like, 63 A.L.R. 5th 607 (1998 and Supp. 2001). In Lawrence v. Zoning Board of Appeals of the Town of North Branford, the court explained terms such as "incidental" and "customary" in view of a zoning ordinance which defined "accessory use," holding that such determinations are matters of fact to be determined by the zoning board. 364 A.2d 552 (Conn. 1969). According to Lawrence, the word "incidental" as employed in a definition of "accessory use" incorporates two concepts. Id. at 554. First, "incidental" means that the use must not be the primary use of the property but rather one which is subordinate and minor in significance. Id. Second, "incidental" must also incorporate the concept of reasonable relationship with the primary use. Id. It is not enough that the use be subordinate; it must also be attendant or concomitant. Id. Further, the term "customarily" places a duty on the board to determine whether it is usual to maintain the activity in question in connection with the primary use of the land. Id. "Incidental" and "customarily" are two separate and distinct inquiries to be made by the zoning board itself. See id.
With respect to the Board's interpretation of the Ordinance, the plaintiffs first argue that the Board's interpretation would create an absurd result. An absurd result is to be avoided, if possible, in the construction of statutes and ordinances. Town of Scituate v. O'Rourke,103 R.I. 499, 239 A.2d 176 (1968); and Radick v. Zoning Board of Review of Town of East Providence, 84 R.I. 472, 125 A.2d 105 (1956). According to the Ordinance, the Home would be allowed to build a swimming pool on its property and invite "outsiders" into its property to use the pool. The children would also be allowed to play on storage sheds, fences, satellite dishes, and greenhouses, all of which the Table lists as a permitted uses on the RM zoned property. Therefore, the same children would be allowed to make the same noise in a different fashion. However, they would be restricted from such activities as bocce ball, horseshoes, croquet, or outdoor barbecues, all of which constitute "accessory uses" requiring some physical alteration of the property. See The Law of Zoning and Planning, Rathkopf, § 23.06[4]. Also, under the Board's interpretation of the Ordinance, if a permit were required to place a basketball net on personal property, the Board would be required to issue (or more likely to deny) a permit for any basketball hoop located on any residential property in the City. This Court finds that the Legislature could not have intended to create such an absurd result.
Plaintiffs' final contention is that the Board's enforcement of the Ordinance violated a clear public policy favoring group homes for children. In determining the meaning of a statute, it is necessary to consider the public policy behind the law. See Albert, id.; and Bartlett v. Amica Mutual Insurance Co., 593 A.2d 45 (R.I. 1991) (holding that contract provisions, particularly those delineating uninsured-motorist coverage, are to be interpreted in light of the public policy for which the Legislature enacted the uninsured-motorist-coverage statute). Most recently in Albert, the Supreme Court considered the effect of the town's zoning ordinance on the Right to Farm Act, Section 2-23-3. Although the Court remarked that there was no statute directly on point, they used the general purpose section of the statute, which stated that remaining agrarian land should be "safeguarded against nuisance actions arising out of conflicts between agricultural operations and urban land uses," as a statement of policy by the Legislature. Albert, 767 A.2d at 665. Therefore, the Court ruled that the legislative scheme, designed to prevent the creation of nuisances, must be interpreted so as to not seriously infringe on ordinary farming operations within the town. Id.
The sources of public policy concerning the State's obligation to protect and to provide for children are too numerous. The public policy purpose of group homes, which, through the Department of Children, Youth, and Families (DCYF) licensing process, must adhere to a rigorous set of rules and regulations designed to promote the welfare of the children for whom they act as caretakers. See G.L. § 42-72-5(7). The statement of purpose of the DCYF itself provides
 "[t]hat the state has a basic obligation to promote, safeguard and protect the social well-being and development of children of the state through a comprehensive program providing for:
 (i) Social services and facilities for children who require guidance, care, control, protection, treatment, or rehabilitation; . . .
 (iv) The setting of standards for social services and facilities for children. . . ." See § 42-72-2.
Title 42, Chapter 72 of the General Laws continues by delineating the goals and powers of the DCYF to license and regulate group homes. Section 42-72-5(a) states:
 "The department is the principal agency of the state to mobilize the human, physical and financial resources to plan, develop, and evaluate a comprehensive and integrated statewide program of services designed to ensure the opportunity for children to reach their full potential" (emphasis added).
Finally, in Chapter 72.1 of Title 42, the Legislature further explains the purpose of licensing child care providers. According to §42-72.1-1(a), "[t]he director of the [DCYF]. . . . shall establish a unit to license and monitor child care providers and child-placing agencies, to protect the health, safety and well being of children temporarily separated from or being cared for away from their natural families" (emphasis added). Thus, from these three statutes alone, a clear public policy favors the establishment of effective group homes, including activities which tend to further the advancement of childhood development therein. The purposes of the Pawtucket Ordinance itself include the promotion of public health, safety, and general welfare of the city, providing a range of uses and intensities appropriate to the character of the city and reflecting current and expected future needs, and the need to shape urban development. See Code of the City of Pawtucket § 410-1. These goals are not inconsistent with the general goals of the DCYF and of the children themselves. Once again, these public policy concerns support the statutory interpretation rendered above.
 Conclusion
After review of the entire record, this Court finds that the Board failed to make findings regarding the use and the proposed accessory use of the property as defined in the Enabling Statute and the Ordinance. Accordingly, this Court remands this decision to the Board for a determination of the primary purpose of the property, and whether a basketball court is customary and incidental to that use. This Court will retain jurisdiction.
[1]The record mentions but does not specify the nature and extent of this cease and desist order. Therefore, it is unclear whether the City objects to the pavement, the net and pole, or a combination thereof.