DECISION
This is an appeal from a decision by the Coastal Resources Management Council (the CRMC) to grant an application submitted by the Harbor Island Improvement Association (the Association) to construct a dock on a lot owned by the Association on Wheatfield Cove Road in the Harbor Island area of the Town of Narragansett, R.I.[1] The Association is a private non-profit organization of property owners in the Harbor Island area. See
Articles of Incorporation, Tr. at 36-42.[2] The Appellants are members of the Association and also own parcels of real estate on Wheatfield Cove Road. See Complaint ¶¶ 1-5.[3] For the reasons set forth below, this Court reverses the decision of the CRMC.
 Facts/Travel
The Association consists of 400 homeowners living in the Harbor Island area. See Tr. at 57-58. Few members of the Association occupy waterfront property, although many of them own boats.See id. at 58. The Association owns dock space that it rents out to its members. See Minutes of Monthly Association Meeting,Tr. at 30.[4] There is a considerable waiting list of members who seek dock space. See Tr. at 55. There are eight existing docks in Wheatfield Cove. See id. at 58.
In an attempt to alleviate the shortage of dock space, the Association decided to construct a new dock facility that would accommodate four small boats and would be located between two of the existing docks in the cove. See id. at 55-56. The proposed dock would extend out from an undeveloped, undersized waterfront lot owned by the Association and designated as Lot 238 on Tax Assessor's Plat Y-1. See id. and Application, Tr. at 13. Although the lot does not meet the size requirements for a residential building, apparently it is large enough to fit four parking spaces. See id. at 56-57; see also Dec. 28, 2002 Letter, Tr. at 23.
The Association engaged the services of professional engineer James P. Lawless (Lawless) to design the proposed dock and float.See Dock Float Design, Tr. at 16-19. The Association also sent a mailing to the forty-nine members on the dock waiting list to inquire whether four of them would be interested in sharing the estimated $15,000 construction cost for the dock. See Tr.
at 60 and Application, id. at 13.[5] In return, the four members would receive exclusive use of the dock and contiguous parking spaces. See Tr. at 61. Actual ownership, management, and maintenance of the dock would remain at all times with the Association. See id. Six members expressed interest in sharing the construction costs and mailed in their deposits.See id. at 60. Of those six applicants, four were chosen to participate in the project. See id.[6]
In December of 2002, Lawless filed an application on behalf of the Association with the CRMC for permission to construct a dock.See Application, Tr. at 13. Several residents of Wheatfield Cove Road wrote to the CRMC to express their objections to the application on a variety of grounds. Objection Letters, Tr. at 43-51. They asserted that the construction would do the following: create parking and traffic problems on the narrow, one-way road; provide inadequately-sized parking spaces on the Association's lot; interfere with their riparian rights; encourage users of the dock to turn their cars around in the objectors' private driveways; increase boat motor emissions, pollution and noise; crowd the cove making it difficult for residents to maneuver their own boats in the area; and accelerate environmental harm by further blocking the natural flow of water through the cove.See id.
The CRMC conducted a duly noticed public hearing on the application on June 10, 2003. See Decision, Tr. at 2.[7] Two representatives of the Association, Stuart Mason (Mason), the Association President, and Carol Measom (Measom), testified in support of the application. See Tr. at 54-63; 75-79; 107-09. Mason testified that "[t]here is no dwelling on the lot. None is proposed." Id. at 55. He further testified that "[w]e have a waiting list for dock space of 49 names." Id.
Measom testified that "so far we have not had any problems at our main dock facility and we don't anticipate any in this location."Id. at 58.
Lawless also testified on behalf of the Association. SeeTr. at 56-59; 64-74. He explained that the dock left ample room for people to move their boats in and out of the cove. Seeid. at 57. He further testified that the proposed parking spaces are adequate for the anticipated traffic. See id.
Lawless also testified that "[t]his is the only vacant lot within the cove and it's only used to put a dock there. It's too small to build a house, and Harbor Island has no intention of ever building there." Id. at 119.
Numerous objectors, including Appellants Donald Greco and Robert Loffredo, testified at the hearing.[8] See Tr.
at 94-104. Consistent with their objection letters, the objectors testified about the potential traffic and parking problems; the lack of any residential structure on the proposed lot; increased pollution and environmental harm; and the navigational problems that the additional dock would cause. See id. In addition, in an attempt to rebut the testimony put forth by Lawless, professional engineer Joseph W. Frisella testified on behalf of the Appellants. See id. at 82-87.
At the conclusion of the hearing, the CRMC voted to approve the Association's application by a vote of four to three. See id.
at 113-14.[9] The CRMC issued a corrected Assent on June 25, 2003. See id. at 5-10. The Assent duly was recorded in the Land Evidence Records for the Town of Narragansett on June 30, 2003. See id. at 10. Thereafter, on October 9, 2003, the CRMC issued a written decision in the matter. See Decision,Tr. at 2-4. The Appellants timely appealed the decision to this Court.
 Standard of Review
The Administrative Procedures Act provides this Court with appellate review jurisdiction over a CRMC decision.[10]
G.L. 1956 § 42-35-15(g). Said statute states that
 "[t]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, interferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Id.
When reviewing a decision under the Administrative Procedures Act, this Court may not substitute its judgment for that of the agency on questions of fact. Johnston Ambulatory Surgical Ass'n,Inc. v. Nolan, 755 A.2d 799, 805 (R.I. 2000). "The court is limited to an examination of the certified record to determine if there is any legally competent evidence therein to support the agency's decision." Barrington Sch. Comm. v. Rhode Island StateLabor Relations Bd., 608 A.2d 1126, 1138 (R.I. 1992). Furthermore, "[l]egally competent evidence is indicated by the presence of `some' or `any' evidence supporting the agency's findings." Rhode Island Pub. Telecommunications Auth. v. RhodeIsland State Labor Relations Bd., 650 A.2d 479, 485 (R.I. 1994).
An agency's decision "can be vacated if it is clearly erroneous in view of the reliable, probative, and substantial evidence contained in the whole record." Costa v. Registrar of MotorVehicles, 543 A.2d 1307, 1309 (R.I. 1988). Furthermore, reviewing Courts should uphold the decision as long as the administrators have acted within their authority to make such decisions. Goncalves v. NMU Pension Trust, 818 A.2d 678, 683
(R.I. 2003) (citing Doyle v. Paul Revere Life Ins. Co.,144 F.3d 181, 184 (1st Cir. 1998)); see also, Coleman v.Metropolitan Life Ins. Co., 919 F.Supp. 573, 580 (D.R.I. 1996).
 The CRMC'S Enabling Statute
The CRMC was created statutorily by the Rhode Island General Assembly to preserve and protect the coastal resources of this state. See G.L. 1956, chapter 23 of Title 46, entitled the Coastal Resources Management Council. Its primary responsibility is "the continuing planning for and management of the resources of the state's coastal region." Section 46-23-6(1)(i). The Rhode Island Supreme Court has held that "[f]ar from granting broad discretion to the council, the statute specifically directs that the CRMC be guided by [the] single overriding criterion: `Preservation and restoration of ecological systems shall be theprimary guiding principle upon which environmental alteration of coastal resources will be measured, judged, and regulated.'"Milardo v. Coastal Res. Mgmt. Council, 434 A.2d 266, 271 (R.I. 1981) (emphasis in original, citing G.L. 1956 § 46-23-1). Given the CRMC's limited legislative power, it must confine its conduct to its expressly defined channels through which the legislature has authorized it to act. See Opinion to the Governor,88 R.I. 202, 145 A.2d 87 (1958) ("It is now generally recognized that certain limited portions of the legislative power, if confined in expressly defined channels, may be vested by the general assembly in other bodies which it authorizes to act as its agents or auxiliaries in carrying out its constitutional duties.").
In order to act as an agent for the state, "the CRMC has been given the authority to develop policies, programs, and regulations that pertain to coastal areas." Strafach v. Durfee,635 A.2d 277, 279 (R.I. 1993) (citing § 46-23-6). Based on this statutory authority, the CRMC has enacted rules and regulations that it must follow when granting an applicant the right to alter or perform activities within the CRMC's jurisdiction. See Rhode Island Coastal Resources Management Program (RICRMP). Consequently, "the regulations are legislative rules that carry the force and effect of law and enjoy a presumption of validity."Parkway Towers Assocs. v. Godfrey, 688 A.2d 1289, 1293 (R.I. 1997) (citing Lerner v. Gill, 463 A.2d 1352, 1358 (R.I. 1983)) (referring to an agency's regulations promulgated pursuant to specific authority granted by the General Assembly).
A CRMC "Assent" is required for any alterations or activities that are proposed for tidal waters, for shoreline features, and for areas that are contiguous to shoreline features. See Section 04 000 CRIR 100.1. Contiguous areas are defined as "all lands and waters directly adjoining shoreline features that extend inland two hundred (200) feet from the inland border of that shoreline feature." Id. Thus, an Assent is required for the construction of a residential boating facility. Pursuant to Section 04 000 CRIR 300.4.A.3 of the RICRMP, a residential boating facility is defined as "a dock, pier, wharf, or float, or combination of such facilities, contiguous to a private residence, condominium, cooperative or other home owners['] association properties that may accommodate up to four (4) boats."
Applications to the CRMC, including applications for permission to construct residential boating facilities, take one of two forms: Category A or Category B. The CRMC may grant a Category A application without following the more stringent procedures which accompany consideration of a Category B request.
 Statutory Interpretation
The Appellants assert that the CRMC erroneously granted permission for the construction of a residential dock facility that is contiguous to an undeveloped piece of property. They maintain that the CRMC did not have the authority to grant such permission because the property lacked any kind of residence. The Appellants rely upon Sections 04 000 CRIR 300.4.A.3 and 04 000 CRIR 300.4.B.2 to support this argument. The Appellees contend that this issue was not raised at the hearing and should be considered waived.
This Court reviews issues of statutory interpretation denovo. See Palazzolo v. State ex rel. Tavares, 746 A.2d 707,711 (R.I. 2000). Moreover, "[t]he Judiciary . . . sits as `final arbiter of the validity or interpretation of statutory law' as well as of any agency regulations promulgated to administer that law." Clarke v. Morsilli, 714 A.2d 597, 600 (R.I. 1998) (quoting DeAngelis v. Rhode Island Ethics Commission,656 A.2d 967, 970 (R.I. 1995)). Where the language of a statute (or regulation) "is clear on its face, then the plain meaning of the statute must be given effect and this Court should not look elsewhere to discern the legislative intent." Retirement Bd. ofEmployees' Retirement System of State v. DiPrete, 845 A.2d 270,297 (R.I. 2004) (internal quotations omitted). When "a statutory provision is unambiguous, there is no room for statutory construction and [this Court] must apply the statute as written."Id. However, when statutory provisions are unclear or ambiguous, this Court examines the statute in its entirety. Inre Advisory to the Governor, 668 A.2d 1246, 1248 (R.I. 1996). Furthermore, in construing a provision, "[t]his [C]ourt has long applied a canon of statutory interpretation which gives effect to all of a statute's provisions, with no sentence, clause or word construed as unmeaning or surplusage." Local 400, InternationalFederation of Technical and Professional Engineers v. RhodeIsland State Labor Relations Bd., 747 A.2d 1002, 1005 (R.I. 2000).
This Court also must be mindful that where "the provisions of a statute are unclear or subject to more than one reasonable interpretation, the construction given by the agency charged with its enforcement is entitled to weight and deference, as long as that construction is not clearly erroneous or unauthorized."Labor Ready Northeast, Inc. v. McConaghy, 849 A.2d 340, 345
(R.I. 2004). Nevertheless, "[a]n agency cannot modify the statutory provisions under which it acquired power, unless such an intent is clearly expressed in the statute." Little v.Conflict of Interest Commission, 121 R.I. 232, 236,397 A.2d 884, 886 (1979). Furthermore, "[t]his Court will not construe a statute to reach an absurd result." State v. Flores,714 A.2d 581, 583 (R.I. 1998) (quoting Kaya v. Partington, 681 A.2d 256,261 (R.I. 1996)).
At issue is the interpretation of the "Recreational Boating Facilities" provision of the RICRMP. See Section 04 000 CRIR 300.4. Recreational boating facilities include residential boating facilities and marinas. See Section 04 000 CRIR 300.4.A. A marina is defined as "any dock, pier, wharf, or float, floating business, or combination of such facilities that accommodate five or more recreational boats." Section 04 000 CRIR 300.4.A.1. Section 04 000 CRIR 300.4.A.3 defines a "residential boating facility" as "a dock, pier, wharf, or float, or combination of such facilities, contiguous to a privateresidence, condominium, cooperative or other home owners[']association properties that may accommodate up to four (4) boats." (Emphasis added).
The Appellants assert that the CRMC erroneously granted the application because a residential boating facility requires there to be a residence on the contiguous property. The Association counters that it validly can construct a residential boating facility because the subject property constitutes "other home owners['] association propert[y,]" as defined by Section 04 000 CRIR 300.4.A.3 . The Association's interpretation is at odds with the policy section of the regulation which provides:
 "In order to limit the cumulative impacts of many individual residential boating facilities, the [CRMC] encourages the construction of facilities that service a number of users. It is the policy of the council to manage the siting and construction of recreational boating facilities within the public tidal waters of the state to prevent congestion, and with due regard of the capability of coastal areas to support boating, and the degree of compatibility with other uses and ecological considerations. The [CRMC] shall require that a residential structure be contiguous to any shoreline site for a proposed residential boating facility." Section 04 000 CRIR 300.4.B.2. (Emphasis Added.)
As noted above, contiguous areas include all lands and waters directly adjoining shoreline features that extend inland two hundred feet from the inland border of that shoreline feature.See Section 04 000 CRIR 100.1. Black's Law Dictionary defines "contiguous" as "touching at a point or along a boundary; adjoining." Black's Law Dictionary 338 (8th ed. 2004).
Taking the CRMC's provisions as a whole, it is clear to this Court that "other home owners['] association properties" should be construed to mean that some type of residential structuremust be on the contiguous property. This interpretation is further supported by the doctrine of ejusdem generic, which "provides that when `a series of specific terms in a statute is followed by a general term * * * the general term, will be construed to embrace only additional examples of a similar nature as those enumerated.'" State v. Oliveira, 882 A.2d 1097,1113-14 (R.I. 2005) (quoting State v. Dearmas, 841 A.2d 659,667 (R.I. 2004)); see also Chavers v. Fleet Bank (RI),N.A., 844 A.2d 666, 676 (R.I. 2004) (stating that "specific words or terms modify and restrict the interpretation of general words or terms where both are used in sequence[.]") However, "[t]he doctrine of ejusdem generis does not apply where the specific terms preceding the general terms share no common characteristic." First Republic Corp. of America v. Norberg,116 R.I. 414, 419, 358 A.2d 38, 41 (R.I. 1976).
Applying this doctrine to Section 04 000 CRIR 300.4.A.3, this Court finds that all of the preceding specific terms — "private residence," "condominium," and "cooperative" — share a common characteristic; namely, they are structures within which people reside. Consequently, the general term, "home owners['] association properties," also must contain a residential structure. Indeed, if this Court were to apply the Association's construction, it would lead to an absurd result because it would require this Court to disregard the word residential as unmeaning or surplusage. Furthermore, considering that this whole proceeding either implicates or specifies that a residential boating facility is at issue, this Court clearly cannot disregard the crucial word "residential" from its statutory interpretation of this regulation. Consequently, this Court concludes that the CRMC, pursuant to its governing statute and rules, may grant applications for residential boating facilities only for properties that contain a residence.
In view of the foregoing, this Court concludes that the CRMC erroneously granted the Association's application to build a residential boating facility on a lot that does and will not contain a residential structure. As noted above, Mason testified "There is no dwelling on the lot. None is proposed." Tr. at 118. The same statement can be found in the Association's application. Lawless also testified that "[t]his is the only vacant lot within the cove and it's only used to put a dock there. It's too small to build a house, and Harbor Island has no intention of ever building there." Tr. at 119. Consequently, this Court must reverse the CRMC's decision on this issue.
 The Application
The Appellants assert that the CRMC erroneously applied the incorrect — and more lax — standard when it considered the Association's application. They further maintain that the Association failed to meet its burden of proof under the proper standard and that the decision also should reversed on this basis.
In the guidelines portion of the RICRMP, applicants are advised about when and how to apply for an Assent. See Section 04 000 CRIR 010. Step Three, entitled "What Regulations Apply?" provides in pertinent part:
 "If the alteration proposed is for tidal waters or for a shoreline feature, turn to the appropriate section of Table 1 and match the activity with the water area and shoreline type. The table will tell you if the activity you propose is prohibited or will be processed as a Category A or Category B application. . . .
 If the proposed alteration is within a critical coastal area, consult the appropriate Special Area Management Plan for the supplemental policies, standards and requirements." Id.
In the present case, it is undisputed that the Association proposed to locate a dock in Type 2 Waters, Low-Intensity Use. Table 1 indicates that an application to construct a residential dock located in tidal waters may be considered under either a Category A or a Category B determination. See id. Such determination must be decided by the CRMC's Executive Director upon receipt of the application. See Section 04 000 CRIR 110.1. It is only when the proposed activities or alterations involve no more than ". . . routine matters and categories of construction and maintenance work that do not require review by the full [CRMC,]" that an application may be treated as Category A. Seeid. The following four criteria must be met before the CRMC can grant an application under Category A:
 "(1) The goals, policies, prerequisites, and standards of . . . [the RICRMP] that apply to the areas and activities in question are met.
 (2) All buffer zone and setback requirements as contained in Sections 140 and 150 are met.
 (3) Substantive objections are not raised by abutters of those Category A applications sent out to public notice, the CRMC members have not raised objections, or the Executive Director has not made a determination that the Category A activity in question is more appropriately reviewed as a Category B activity.
 (4) Proof of certification of compliance with all applicable state and local statutes, ordinances, and regulations is provided."
 Section 04 000 CRIR 110.1.
Furthermore, in determining whether or not to grant an Assent for a residential boating facility, the CRMC shall evaluate the following:
 "(a) the appropriateness of the structure given the activities potential to impact Rhode Island's coastal resources;
 (b) the appropriateness of the structure given geologic site conditions;
 (c) the potential impacts of the structure and use of the structure on public trust resources (e.g., fin fish, shellfish, submerged aquatic vegetation, etc.);
 (d) the potential navigational impacts of the structure and associated uses of the structure;
 (e) the potential aesthetic and scenic impacts associated with the structure; and
 (f) the cumulative impacts associated with the increased density of existing recreational boating facilities in the vicinity of the proposed project." Section 04 000 CRIR 300.4.B.11.
Additionally, "the [CRMC] shall weigh the benefits of the proposed activity against its potential impacts while ensuring that it does not cause an adverse impact on other existing uses of Rhode Island's public trust resources." Id.
Once the Executive Director verifies that the above criteria have been met, "an Assent for the proposed activity or alteration will be issued." Section 04 000 CRIR 110.1. If the criteria are not verified or a substantive objection[11] is filed, then "the application shall be considered a Category B application and will be reviewed by the full [CRMC]." Id. Because "[t]he word `shall' usually connotes the imperative and contemplates the imposition of a duty[,]" (Conrad v. State of R.I. Medical CenterGeneral Hosp., 592 A.2d 858, 860 (R.I. 1991)), this Court finds that such language is "mandatory rather than permissive." Id.
Thus, if the construction of a residential boating dock does not meet the criteria under Category A, the applicant must proceed under Category B as set forth in Section 04 000 CRIR 300.4.
The Association and the CRMC assert that the Executive Director properly found that a Category A analysis was appropriate and that the CRMC did not err in so treating the application. However, further review of Table 1 reveals that this assertion has no merit. That is because Table 1 requires a Category B analysis for applications for docks that will be located on beaches, bluffs or coastal wetlands.
In its decision, the CRMC specifically found that dock would be located in Wheatfield Cove and that "[t]he coastal feature is a coastal beach with coastal wetland (fringe marsh) backed by coastal bluff." Decision, Tr. at 02. The CRMC further found that "[t]he applicable provisions of the CRMP are Sections 200.2, 210.1, 210.3, 210.4, 300.1 [Category B], 300.2, 300.4, 300.18 and SAMP[12] provisions." Decision, Tr. at 2 (emphasis added). Having made these findings, it then was incumbent upon the Executive Director to consider it as a Category B application.
 Category "B" Applications
When applications for an Assent require a Category B analysis, the applicants and the CRMC must adhere to stricter standards, policies, and prerequisites. All Category B applications must go before the full Council, and the applicant must demonstrate, inwriting, that all eleven (11) requirements set forth in Section 04 000 CRIR 300.1 are met. These requirements are
 "1. demonstrate the need for the proposed activity or alteration; 2. demonstrate that all applicable local zoning ordinances, building codes, flood hazard standards, and all safety codes, fire codes, and environmental requirements have or will be met; local approvals are required for activities as specifically prescribed for nontidal portions of a project in Sections 300.2, 300.3, 300.6, 300.8, 300.9, 300.11, 300.13, 300.15 and 300.17; for projects on state land, the state building official, for the purposes of this section, is the building official;
 3. describe the boundaries of the coastal waters and land area that are anticipated to be affected;
 4. demonstrate that the alteration or activity will not result in significant impacts on erosion and/or deposition processes along the shore and in tidal waters;
 5. demonstrate that the alteration or activity will not result in significant impacts on the abundance and diversity of plant and animal life;
 6. demonstrate that the alteration will not unreasonably interfere with, impair, or significantly impact existing public access to, or use of, tidal waters and/or the shore;
 7. demonstrate that the alteration will not result in significant impacts to water circulation, flushing, turbidity, and sedimentation;
 8. demonstrate that there will be no significant deterioration in the quality of the water in the immediate vicinity as defined by DEM;
 9. demonstrate that the alteration or activity will not result in significant impacts to areas of historic and archaeological significance;
 10. demonstrate that the alteration or activity will not result in significant conflicts with water-dependent uses and activities such as recreational boating, fishing, swimming, navigation, and commerce, and;
 11. demonstrate that measures have been taken to minimize any adverse scenic impact (see Section 330)." Section 04 000 CRIR 300.1.
Depending on the special circumstance of each proposed activity, additional Category B sections may become pertinent as well.[13]
Section 04 000 CRIR 200.2 of the RICMCP addresses Type 2 Low-Intensity Uses. It specifically recognizes that "[c]ontinuing residential development within the watersheds of the salt ponds poses severe threats to future water quality in the form of both bacterial contamination and eutrophication." See Section 04 000 CRIR 200.2.B.2. Pursuant to the policy section of that regulation:
 "3. Residential boating facilities . . . may be permitted in Type 2 Waters, provided it can be demonstrated that there will be no significant adverse impact to coastal resources, water dependent uses or public's use and enjoyment of the shoreline and tidal waters of the State. It is the Council's policy that one or more of the following conditions describe a situation, condition, or proposal that is deemed to have significant adverse affect on Rhode Island's coastal resources and therefore is grounds for denial or modification of an application for an Assent:
 (a) The construction of the proposed facility may cause significant impacts on coastal wetlands and other public trust resources (e.g. shell fish, fin fish, submerged aquatic vegetation etc.);
 (b) Access to the construction site is not available without causing significant impacts to Rhode Island's coastal resources (e.g. coastal wetlands);
 (c) The proposed facility would significantly interfere with and/or impact other public trust uses of the tidal or intertidal areas of the shoreline (e.g. interfere with navigation);
 (d) Water depths adjacent to the site would require dock span lengths in excess of the standards contained in section 300.4.E in order to allow normal and appropriate use if the dock by a vessel.
 (4) Applicants for Counsel Assents for alterations or activities in Type 2 waters shall describe the measures taken to mitigate impacts on the scenic quality of the area (see Section 330)." Section 04 000 CRIR 200.2.C. (Emphasis added.)
This Court finds that there is no evidence that the Association ever followed any of the above-mentioned mandates. In its application, the Association merely stated:
 "We propose to build a 48 ft. fixed timber pier with a 36' x 4' float. There is no dwelling on the lot and none is proposed. No clearing is proposed except where the stairs are proposed. Four boats will use the facility and there is sufficient parking space for the users." Application, Tr. at 13.
While the Association included plans for the proposed dock and maps of the area, that was not enough for it to sustain its burden under Sections 04 000 CRIR 300.1 and 04 000 CRIR 200.2.C.
Considering the lack of evidence presented by the Association with respect to the above-mandated criteria, the CRMC clearly was not in a position to consider the application properly using the Category B standard. For example, the CRMC found in its decision that "[t]he CRMC staff advised the full Council that there are no parking standards for residential boating facilities."Decision, Tr. at 3. While that statement technically may be correct, it ignores the fact the Association had the burden to "demonstrate that all applicable local zoning ordinances, building codes, flood hazard standards, and all safety codes, fire codes, and environmental requirements have or will be met[.]" Section 04 000 CRIR 300.1. There is no evidence that the Association ever attempted to meet that burden. Indeed, when counsel for the objectors questioned Lawless about conformance with the parking provisions of the zoning ordinance, he responded: "I don't have to comply with the Town requirement. This [the ordinance] is for zoning and for commercial operation. This is a commercial operation. This is a patch of grass on the top of a hill." Tr. at 65.
Shortly thereafter, Executive Director of the CRMC, Grover Fugate cut off this whole line of questioning by stating "[t]here are no parking standards for residential boating facilities. So, this testimony is not pertinent." Id. at 66. This clearly was erroneous in light of the requirements contained in Section 04 000 CRIR 300.1(2), supra.
Another of the CRMC's findings demonstrates the erroneous nature of its decision. It found as follows:
 "The staff biologist concluded that the proposed facility appears to meet all programmatic requirements for construction of a dock at the location proposed. The affected area currently contains a dense assemblage of residential docks.
The staff biologist concluded that the construction and use of an additional dock in this area does not represent a significant environmental impact." Id.
at 3 (Emphasis added.)
This conclusory finding was arbitrary because, while the proposed facility may have appeared to the biologist to "meet all programmatic requirements[,]" neither the decision nor the biologist's report explained the basis for reaching that conclusion. Moreover, it conveniently ignores the fact that the "programmatic requirements" are mandatory; thus, only appearing to be met is an insufficient reason for granting an application.
This Court's review of the biologist's report reveals that while the objectors had environmental concerns "`with increase[ed] boat motor emissions and noise[,]'" he dismissed those concerns by stating "it is difficult to conclude that that these concerns can be considered substantive considering the rather congested boating activities already present in this particular cove." Biologist's Report, Tr. at 11. This statement contradicts Section 04 000 CRIR 200.2.B.2, which expresses concern about the impact of further development on the scenic value and aquatic life of Type 2 Low-Intensity use areas. It also ignores the cumulative impact that the dock might have on the area and its congestion. See Section 04 000 CRIR 300.4.B.2,supra (discussing the policy of limiting the cumulative impact of residential boating facilities).
Furthermore, although lay testimony may not be considered as evidence (see Toohey v. Kilday, 415 A.2d 732, 737 (R.I. 1980)), the objectors' testimony suggests that the Association may not have been able to sustain its burden of proof. Edith Kroha testified as follows:
 "My concern is the environmental impact. . . . At one point there was a conduit under the road, so that water outside of this cove flushed in. That has since been filled in, so there is much less water exchanged.
 Since I came there in 1984 the cove has become much more shallow because there is not this flow of water. The addition of four boats would contribute to the pollution in the cove. It is a fragile environment that you should protect." Tr. at 94-95.
See also Tr. at 99 ("It may be in a residential area, but it's not a residential dock."); Tr. 100 ("This dock is going to impede my use of my dock."); Tr. at 104 (stating "when you've got four people, you've got a marina and you've got all the problems of a marina [like trash]. . . .").
It is axiomatic that although a reviewing justice has "the authority to remand a case to the zoning board of review for further proceedings [,] [t]his authority . . . should not be exercised in such circumstances as to allow remonstrants another opportunity to present a case when the evidence presented initially is inadequate." Roger Williams College v. Gallison,572 A.2d 61, 62 (R.I. 1990). Furthermore, "[t]he remand for further proceedings should be based upon a genuine defect in the proceedings in the first instance, which defect was not the fault of the parties seeking the remand, or upon the fact that there is no record of the proceedings upon which a reviewing court may act." Id. (internal citations omitted).
Since the Association failed to submit the requisite evidence for a Category B application, this Court will not remand the case for the taking of additional, new evidence; instead, it reverses the decision on this issue. Thus, even if there had been a residential structure on the property, this Court still would reverse the decision of the CRMC because it improperly treated the application as a Category "A" rather than a Category "B" application.
 Conclusion
This Court finds that the CRMC's granting of the application was in violation of statutory and regulatory provisions, was in excess of the authority granted to the CRMC, and was arbitrary and capricious. The CRMC's decision also was affected by error of law and was characterized by an abuse of discretion. Substantial rights of the Appellants have been prejudiced. Accordingly, this Court reverses the CRMC's decision.
Counsel shall submit an appropriate order consistent with this opinion.
[1] Wheatfield Cove Road is adjacent to Wheatfield Cove which is part of Point Judith Pond. See Application Tr. at 13. The water in the cove is designated as Type 2 water under the Coastal Resource Management Council (the CRMC) regulations. SeeDecision at Tr. at 2 ("The proposed project abuts Type 2 Waters, Low-Intensity Use, Point Judith Pond.").
[2] "Tr." refers to the Certified Administrative Record.
[3] Appellant Donald Greco, as Trustee of the Elaine C. Greco Qualified Residence Trust Numbers 4, 5, and 6, owns Lot 239 on Tax Assessor's Plat Y-1, while Appellants Robert Loffredo, Jeffrey A. Gaess and Linda Ann Gaess own Lots 234 and 235, respectively. Jeffrey Gaess and Linda Gaess jointly own Lot 236 on the same Tax Assessor's Plat. See Complaint ¶¶ 1-5.
[4] The Minutes specifically stated: "Ernie reported that all unused docks were successfully rented during the months of June and July." Minutes of Monthly Association Meeting, Tr. at 30.
[5] There is no evidence to suggest that this inquiry is consistent with previous Association practices or that homeowners on the waiting list for dock space had ever before advanced to the top of the list by agreeing to contribute funds for the construction of a slip. Furthermore, it is unclear from the record how long the selected members would retain their exclusive rights to the dock and parking spaces and whether they would be required to pay the usual dock rental fee in addition to the construction costs.
[6] It is not clear to this Court how the Association narrowed the field of candidates to the four chosen members.
[7] One of the board members, Jerry Sahagian, recused himself from the hearing.
[8] The other objectors to testify in opposition to the proposed dock were Edith Kroha, Malcolm Bromberg, and Dr. Stanley Simon. See Tr. at 94-104. Edith Kroha and Donald Greco testified that they each own property abutting Lot 238. SeeId. at 94 and 98. Dr. Stanley Simon and Malcolm Bromberg live across the street from the Association's lot. See Id. at 95-96. Robert Loffredo stated that he owns two lots east of the proposed dock. See Id. at 100.
[9] A vote to deny the application was defeated by a similar vote of four to three.
[10] The Appellants do not contest jurisdiction in this matter.
[11] Section 04 000 CRIR 110.3 defines examples of what a Substantive Objection would entail. Upon a legitimate Substantive Objection, Category A applications must be viewed as a Category B application. In its decision, the CRMC found that objections raised by the objectors were not substantive. See Decision,Tr. at 3.
[12] Salt pond region special area management plan.
[13] For example, compliance with Section 04 000 CRIR 300.18 is required when applicants propose activities in tidal waters under "Sections 300.3, 300.4, 300.6, 300.9, 300.10, 300.11, and 300.15." Section 04 000 CRIR 300.18.D.1 (emphasis added). Under this section, the applicant "shall include a detailed inventory of the [Submerged Aquatic Vegetation] SAV resources present."Id.